IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2003 Session

## STATE OF TENNESSEE v. SANDRA LYNN BAUMGARTNER

**Appeal from the Criminal Court for Shelby County**
**No. 01-11924     John P. Colton, Jr., Judge**

_____

**No. W2003-00038-CCA-R3-CD  - Filed April 14, 2003**

_____

The defendant, Sandra Lynn Baumgartner, appeals the mandatory outpatient treatment (MOT) plan imposed by the Shelby County Criminal Court following her acquittal of first degree murder due to her insanity at the time of the crime.  She contends that the trial court erroneously required mandatory outpatient treatment because the evidence does not show that her mental condition is likely to deteriorate rapidly, making it substantially likely that she would cause serious harm.  She also argues that the MOT plan imposed by the trial court is contrary to the medical proof, punitive, oppressive, and impossible to perform.  We conclude that the evidence preponderates against the MOT plan's requirements that the defendant live in a supervised residential facility and have someone supervise the administration of her medicine.  We affirm the MOT plan as modified to exclude these requirements and remand the case for the trial court to reinstate the original condition that the defendant reside with her parents in their home.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified; Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Seymour S. Rosenberg, Memphis, Tennessee, for the appellant, Sandra Lynn Baumgartner.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; James A. Wax, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was charged with the April 2001 first degree premeditated murder of Daniel Morgan.  She pled not guilty by reason of insanity.  Before her bench trial, she stipulated to the facts that she and the victim had an altercation at his apartment and that she had stabbed him multiple times, which resulted in his death.  The record reflects that at her May 16, 2002 bench trial, the

parties stipulated and the defendant presented evidence that at the time of the offense, she had Schizoaffective Disorder, Bipolar Type, and was not able to appreciate the wrongfulness of her conduct. The trial court found the defendant not guilty by reason of insanity. It initially found that an evaluation of the defendant's mental condition was not necessary and that she did not pose a continuing danger to society. Following the state's petition to rehear, the court ordered the defendant to be admitted to Western State Mental Health Institute on September 27, 2002, for mandatory evaluation and treatment. See Tenn. Code Ann. § 33-7-303(a). She was subsequently transferred to Memphis Mental Health Institute (MMHI) for the evaluation.

On November 25, 2002, Dr. Travis McNeal of MMHI sent the trial court a letter stating that a MMHI team had evaluated the defendant and concluded that she should be discharged into the community under a proposed MOT plan. The proposed plan is summarized as follows:

(1) Upon her release from MMHI, the defendant will receive regular mandatory outpatient mental health services from a nurse practitioner and psychiatrist at Frayser Family Counseling Center (FFCC) in order to evaluate her mental status and need for changes in medication. She will meet once monthly with nurse practitioner Susan Wooldridge and once every six months with Dr. Clayton Baker. These professionals will review the defendant's compliance, medication education, and mental status. Changes in her medication will only be made following an examination by Dr. Baker.

(2) The defendant's case will be intensely managed by FFCC's Continuing Treatment Team (CTT). She will meet once weekly with case manager Hugh Callens, who will insure that she is advised of all appointments, has arranged transportation, and is compliant with her medication. Mr. Callens will provide behavioral observations to Dr. Baker in order that Dr. Baker can continuously monitor her mental condition and need for medication changes. In the event that the defendant fails to comply with the MOT plan or problems arise, Mr. Callens will inform the FFCC treatment team and Laverne Hoke, the supervising administrator, who will decide whether to notify the court of a violation.

(3) The defendant will participate in weekly alcohol and drug treatment meetings at FFCC. Ms. Hoke coordinates this group, which meets on Wednesdays from 3:00 to 4:30 p.m. The defendant will be subject to random urine screens for drugs, and FFCC will notify the trial court in writing of a positive drug screen within seven days.

(4) The defendant will attend Alcoholics Anonymous (AA) meetings at Family Fellowship at least once weekly.

(5) The defendant will receive individual therapy at least twice monthly from Dr. Robert Serino, who is a licensed clinical psychologist.

(6) The defendant will continuously live with her parents, Bob and Carol Baumgartner, who reside in a single-family dwelling. The defendant and her parents will be the only occupants of their home.

The proposed plan also provides that FFCC will be responsible for administering and reviewing the plan, notifying the court of a violation, and/or terminating the plan through the court. The proposed plan was signed by the defendant, her parents, Ms. Hoke, and Dr. Serino.

On December 6, 2002, the trial court conducted a hearing on the issue of outpatient treatment. Dr. McNeal, a licensed staff psychologist and forensic coordinator, testified that he evaluated the defendant at MMHI. He said that her symptoms were well under control and that she did not meet the criteria for continued commitment to a mental institution. He said that the defendant should be returned to the community under a "fairly intensive" MOT plan supervised by the trial court. He stated that he developed the proposed MOT plan in collaboration with FFCC, the defendant's parents, Dr. Serino, and the MMHI treatment team.

Dr. McNeal testified that he was aware that the defendant was accused of stabbing the victim with a knife 120 times. Regarding her potential for committing future violent crimes, he noted that she had received mental health treatment from 1992 until the offense in 2001 and had no aggressive behavior during that time. He said the present offense was precipitated by her antipsychotic medication being inadvertently switched to an antidepressant, which led to the atypical deterioration of her mental functioning over a period of months. He said that after the offense, she had not displayed any aggressive behavior. He stated that while at MMHI, the defendant had shown no symptoms of her mental illness, which is well-controlled by her medicine. He characterized her as kind and helpful to the other patients. He said that the isolated incident of violence seemed to have occurred from special circumstances and that it was safe to return the defendant to a community treatment program under fairly intensive supervision.

On cross-examination, Dr. McNeal testified that it was important for the defendant to continue alcohol and drug treatment, although attending a meeting at the specific time directed in the proposed MOT plan was not essential. He agreed that she could attend an evening or weekend meeting if she had a work conflict. He stated that upon her return to the community, the defendant would benefit from being in a supportive environment, such as living with her parents. He said that the monitoring aspect of this requirement was also important and that her parents would have regular contact with her to make sure she was mentally stable. He said her parents were still active and worked at least part-time.

Dr. McNeal denied that the plan's required living arrangements were based upon the need for the defendant's parents to monitor whether the defendant took her medicine. He said that the

defendant did not need daily supervision in taking her medicine and that she was intelligent and stable enough to handle administering her medicine herself. He said, instead, it was important for her to go to a mental health facility regularly in order that the center's employees could monitor her mental status and how the medications were affecting her. He said he and the defendant had discussed the problems that arose from the change in her medicine before the offense. He said that as a registered nurse, the defendant was presently aware of the implications stemming from a change in her medication and would be very careful about such changes in the future. He said that if the defendant stopped taking her medicine or refused to see a doctor, the outpatient providers could initiate her return to a hospital and/or could notify the court via facsimile of her noncompliance.

Dr. Eric Smith, a staff psychiatrist, testified that he participated in the defendant's evaluation and treatment at MMHI. He said the defendant's mental illness was comprised of psychotic symptoms and mood symptoms, which included both mania and depression. He said that when she came to MMHI, she was taking Geodon, an antipsychotic medication, twice daily. He said that Geodon is used primarily to control delusions and hallucinations and that the defendant was taking the maximum dosage. He believed that the FFCC had prescribed this for her and that she should continue on it indefinitely unless she started experiencing side effects. He said not much would happen if she missed one dose of Geodon, but missing it on a continuing basis raised the possibility that her psychotic symptoms would reoccur.

Dr. Smith testified that the defendant was also taking Seroquel, an antipsychotic medication, once daily at bedtime. He said that she was taking this medicine before the offense and that it had been replaced with the antidepressant Serzone. He said someone with the defendant's diagnosis can be treated with an antidepressant, but if the antidepressant is not closely monitored, it can exacerbate the patient's symptoms. He said that when Serzone was substituted for Seroquel, the defendant had nothing to prevent her delusions and hallucinations and that as a result, she became psychotic. He believed that the defendant needed to continue on Seroquel indefinitely, pending any side effects. He said the defendant was also taking Depacoat E. R., a mood stabilizer, twice daily when she came to MMHI. He said that because she was experiencing hair loss as a side effect of the Depacoat, he switched her to Trileptal, which she also takes twice daily. He said Trileptal is an anticonvulsive medicine commonly used in psychiatry as a mood-stabilizing agent to prevent the patient from having manic symptoms. He said that the defendant takes all of these medications orally in pill form.

Dr. Smith testified that if the defendant missed any of her medications, the effect would not be immediate. He said she would have to discontinue the medications for several days or weeks before one would start to see notable changes in her. He said that if such were the case, the defendant could become manic, which would involve not needing to sleep and increased impulsiveness, and might exhibit more aggressive behavior. He said the latter change includes physical violence but could also involve being pushier, more insulting, and not as in-control of oneself as normal. He agreed that if the defendant did not take her medications for several days, she would be at greater risk of stabbing someone multiple times than the average person. He said that as long as the defendant is stable, she is able to do any type of work she feels capable of doing. He

-4-

agreed that it would benefit the defendant and the community if she saw health care providers on a very frequent basis as described in the MOT plan.

Shirley McGowen, a licensed professional counselor, testified that she worked for FFCC, a comprehensive community mental health center that provides outpatient services to people of all ages. She said FFCC employs licensed nurses, pharmacologists, and psychiatrists and is primarily funded through Advocare, the managed care organization of TennCare. She said the defendant received outpatient treatment at FFCC for about one year following the offense and before being sent to MMHI. She said that during this time, the defendant reported taking her medications and exhibited no symptoms contradicting her reported compliance. She characterized the defendant as a good patient and said that the staff found her to be compliant. She said the defendant attempted to work in the community and to maintain a stable life during this time despite the stress stemming from the offense. She said she had worked with the defendant and was familiar with the defendant's proposed MOT plan. She said that the MOT plan differed from the defendant's earlier treatment at FFCC in that the defendant would work more intensely with a case manager, who would visit her weekly at home. She said that under the defendant's former treatment, her case manager conducted home visits once or twice each month.

Ms. McGowen testified that after the proposed MOT plan was developed, Advocare stopped enrolling patients in FFCC's continuous treatment team, which provides the most intensive outpatient care available at FFCC. She said that unless Advocare made an exception for the defendant, she would not be able to participate in the CTT as required by the MOT plan. She stated that the defendant could participate in other, less intensive outpatient programs at FFCC. With respect to other outpatient options, she said the defendant should still meet monthly with Dr. Patty Jordan, a pharmacologist who had been working with the defendant. She said Dr. Jordan would work in conjunction with Dr. Clayton Baker, a psychiatrist, who would assess the defendant if a need to change her medicine arose. She said that if the defendant were required to attend weekly group meetings at FFCC, they could monitor her attendance and performance in alcohol treatment. She also recommended that a case manager visit the defendant and her parents at home on a monthly basis. She believed that an outpatient treatment plan involving these elements would be feasible given the stability that the defendant exhibited both now and before going to MMHI.

Ms. McGowen testified that FFCC did not dispense medication to patients on a daily basis and that a patient needing that service would have to be in a supervised living situation or a hospital. She acknowledged that anyone in a voluntary program who was responsible for taking their own medications could choose to stop taking them. She said that in a serious situation, the FFCC would remain in contact with the patient and her support systems to discern any problems. She said that if the defendant missed a meeting, they would call her to learn the reason behind the noncompliance. She said the FFCC follows MOT patients more closely because they need more supervision and encouragement to comply with their plans. She said she currently supervised two clients who had killed people and were not placed in a MOT program. In response to questioning by the trial court, Ms. McGowen testified that a facility providing a supervised living situation, such as Higbee House, could administer medication on a daily basis. She noted that most of the residents of Higbee House

-5-

were lower functioning than the defendant. She observed that if the defendant were required to take her medicine at a mental health clinic, the defendant would have to travel to and from the clinic twice daily because she took medicine two times per day.

Laverne Hoke, licensed professional counselor and supervisor of FFCC's continuous treatment team, confirmed that TennCare would no longer fund the treatment proposed in the MOT plan. She said that TennCare would fund outpatient treatment at FFCC that involved the defendant seeing Dr. Baker every six months, seeing her psychologist twice each month, seeing a pharmacologist once per month, and participating in counseling sessions. She also confirmed that FFCC's clinics did not administer medicine on a daily basis. She said that supervised residential homes provided this service but that she believed the defendant was higher functioning than the residents of these homes.

The trial court called the defendant's parents. Carol Baumgartner, the defendant's mother, testified that she felt the defendant's mental condition was stable and had been good while the defendant was being treated at FFCC. She said the defendant was capable of transporting herself to meetings and appointments. She said that the defendant was responsible about taking her medicine and that the offense did not occur because the defendant failed to take her medication but because she took the wrong medication. She said that the defendant had lived with her for the last few years and that, at the time, she was not aware that the defendant was having problems with an incorrect medication. Robert Baumgartner, the defendant's father, testified that the defendant was taking her medicine and would continue to do so. He stated that the defendant functioned normally during the time she lived with them and that he and his wife were surprised by the offense. He said that at the time of the offense, the only changes in the defendant that he noticed were that she was a little more complacent, less active, and working long hours.

The trial court also called the defendant who testified that she was a registered nurse. She said that she was taking her medicine daily as prescribed and that she felt more stable because she was taking the correct medication. She stated that she was a recovering alcoholic and attended AA meetings two or three times each week. She said she did not need help taking her medicine but agreed she would comply if the court ordered her to go to a clinic to take her medicine each day. She said that she had a driver's license and transportation to comply with that requirement. She stated that she would like to get a job but did not think she would be able to work if she had to drive to FFCC twice daily. She said that she would go to a residential facility or halfway house temporarily if that is what the court ordered.

The trial court imposed the proposed MOT plan with the following modifications:

> (1) The defendant will be placed in residential housing with an employee on duty twenty-four hours per day,
>
> (2) The administration of her daily medications will be supervised at least five days per week,

(3) The defendant will attend AA meetings three times weekly and will get a sponsor,

(4) She will see a doctor every six months, and

(5) The trial court will receive monthly reports regarding the defendant, and she will report to the trial court once every six months.

The trial court also ordered that the defendant's treating professional file a report with it and the state every six months regarding the defendant's continuing need for treatment. We note that following the imposition of mandatory outpatient treatment, the defendant was detained at MMHI beyond the statutorily prescribed ninety-day period because MMHI could not place the defendant in a residential treatment program that provided twenty-four-hour supervision. This continuing detention was the subject of a separate habeas corpus appeal to this court, and we ordered the defendant's immediate release to her parents' home subject to the remainder of the trial court's MOT plan pending resolution of this appeal. Sandra Baumgartner v. Memphis Mental Health Institute, No. W2003-00118-CCA-R3-CO, Shelby County (Tenn. Crim. App. Mar. 4, 2003) (order).

## I. MANDATORY OUTPATIENT TREATMENT

The defendant contends that she does not meet the statutory criteria to require mandatory outpatient treatment. Specifically, she argues that the record does not support the trial court's finding that her mental condition is likely to deteriorate rapidly to the point that she poses a substantial likelihood of serious harm. The state contends that all medical personnel involved in this case have determined that mandatory outpatient treatment is necessary for the defendant. We agree with the state that the record supports the need for mandatory outpatient treatment.

Following an acquittal on the basis of insanity, a trial court may order the acquittee to participate in outpatient treatment only if it "determines that the person's condition resulting from mental illness is likely to deteriorate rapidly to the point that the person will pose a substantial likelihood of serious harm under § 33-6-501 unless treatment is continued." Tenn. Code Ann. § 33-7-303(b)(3). A person poses a substantial likelihood of serious harm if the person (1) has threatened or attempted suicide or serious bodily harm to him or herself or (2) has threatened or attempted homicide or other violent behavior to another or (3) has caused others reasonably to fear violent behavior or serious bodily harm or (4) is not able to avoid severe injury or impairment from particular risks and the harm specified in one of these four categories is substantially likely to occur unless the person is placed into involuntary treatment. Tenn. Code Ann. § 33-6-501. We review a trial court's determination that mandatory outpatient treatment is necessary de novo upon the trial court's record with a presumption of correctness unless the evidence preponderates otherwise. See T.R.A.P. 13(d); State v. Tripp, 754 S.W.2d 92, 94 (Tenn. Crim. App. 1988) (reviewing the trial court's denial of release from judicial commitment into mandatory outpatient treatment).

The defendant argues that her mental condition is not likely to deteriorate rapidly because she has demonstrated her ability to manage her mental illness on her own. In support of this contention, she asserts that she is a registered nurse, that she has substantial community support in her parents, and that she has an uninterrupted history of compliance with both prescribed medication and treatment. She notes that the psychotic episode that preceded the killing of the victim was not due to her noncompliance with her medicine but to a third party's error. She also relies upon the trial court's September 9, 2002 finding that she did not pose a continuing danger to society and could continue on mandatory outpatient treatment without an evaluation under § 33-7-303(a). Finally, she asserts that the record contains no proof supporting a finding that her mental condition is likely to deteriorate rapidly.

The defendant's arguments center around the theme that while she is maintaining her medication and treatment, her condition is not likely to deteriorate. We believe that she misconstrues the statutory language requiring a finding that the mental condition is likely to deteriorate "unless treatment is continued." Her personal potential to maintain her medication is irrelevant to the inquiry. With regard to the likelihood of deterioration in the absence of treatment, Dr. Eric Smith testified that if the defendant stopped taking her medication for a continuing time period, she would become psychotic. He noted with respect to the antipsychotic Seroquel, "that medication was the one that was substituted by the Serzone. I mean, you saw what the results were, so, in all honesty, I think that would be a medication that she would need to be continued on, indefinitely, . . . ." By this testimony, we take Dr. Smith to be saying that without continued treatment on Seroquel, the defendant's condition could deteriorate to the point that she could kill someone.

Relative to the speed with which the defendant's mental condition is likely to deteriorate, Dr. Smith testified that the defendant could experience notable changes, including aggressive behavior, if she missed her medication for several days. We note that Dr. Travis McNeal testified that he believed that the defendant should be released into the community on "fairly intensive" mandatory outpatient treatment. This evidence is sufficient to support the trial court's finding that the defendant's mental condition is likely to deteriorate rapidly in the absence of treatment. The evidence does not preponderate against the trial court's finding that the defendant needs mandatory outpatient treatment.

## II. CONDITIONS OF MANDATORY OUTPATIENT TREATMENT

The defendant also challenges the modifications the trial court made to her original MOT plan, contending that twenty-four-hour residential treatment and daily supervised administration of her medicine is contrary to the medical proof and punitive, oppressive, and impossible in nature. She asserts that Dr. McNeal testified that she did not need someone to supervise her taking her medicine or living arrangements involving twenty-four-hour supervision. She argues that she had no problems maintaining her treatment and taking her medication while she was on bond and living with her parents. Finally, she maintains that no living facility providing twenty-four-hour supervision is available, making this condition of her MOT plan impossible to perform. She asks this court to reinstate the original MOT plan set out in the trial court's September 9, 2002 order. The state

contends that the defendant improperly bases her arguments upon testimony from her habeas corpus hearing. It argues that the medical proof from the November 25, 2002 hearing reveals that she needs supervision in her living arrangements and the administration of her medicine. It also asserts that the imposed MOT plan is not punitive, oppressive, or impossible.

We view the trial court's requirement that the defendant live in a residential facility with twenty-four-hour supervision to violate the statutory provision for <u>outpatient</u> treatment. Section 33-7-303(b)(3) permits the trial court to order a defendant not subject to judicial commitment "to participate in outpatient treatment" if it finds that the defendant's mental condition is likely to deteriorate rapidly, causing the defendant to pose a substantial likelihood of serious harm. In interpreting a statute, our role is to give effect to the legislature's intent when enacting the statute. <u>Owens v. State</u>, 908 S.W.2d 923, 926 (Tenn. 1995). In the absence of a statutory definition of the term "outpatient," we discern the legislative intent by looking to the plain meaning of the language used. <u>See</u> <u>State v. Walls</u>, 62 S.W.3d 119, 121 (Tenn. 2001). The plain meaning of the term outpatient involves the patient leaving the treatment facility rather than residing there. <u>See</u> <u>Webster's Third New International Dictionary</u> 1603 (3d ed. 1993).

Furthermore, we are to read statutes relating to the same subject matter together. <u>State v. Williamson County Hosp. Trustees</u>, 679 S.W.2d 934, 936 (Tenn. 1984). Our interpretation of outpatient in section 33-7-303(b)(3) is supported by the use of outpatient in the sections outlining the provision of mandatory outpatient treatment for those with a mental illness. With regard to an outpatient treatment plan,

> [t]he releasing facility shall provide a clear written statement of what the service recipient shall do to stay in compliance with the plan to the service recipient; the service recipient's parents, legal custodian, or legal guardian if the service recipient is a child; the service recipient's spouse or other adult family member <u>with whom the service recipient would live</u>; and the service recipient's conservator.

Tenn. Code Ann. § 33-6-603(b) (emphasis added). This provision expressly contemplates that the person subject to the outpatient treatment plan will not be living in a residential treatment facility. Additionally, the definition of community mental health center contrasts outpatient services with those provided onsite at a hospital or other treatment facility: "Provides outpatient services, including specialized outpatient services for persons of all ages with a serious mental illness, and persons who have been discharged from inpatient treatment at a hospital or treatment resource." Tenn. Code Ann. § 33-1-101(6)(A). Reading these provisions together with section 33-7-303(b)(3), we conclude that requiring the defendant to live in a group home or halfway house that provides twenty-four-hour supervision is not consistent with outpatient treatment. Although we note that the Shelby County Criminal Court has imposed mandatory outpatient treatment involving residence in a group home or twenty-four-hour residential supervision on two other occasions, the propriety of these requirements as outpatient treatment was not before this court on appeal. <u>See</u> <u>State v. Jackie</u>

H. Martin, No. 02C01-9512-CR-00374, Shelby County (Tenn. Crim. App. Dec. 2, 1996); State v. Betty Jean Brown, No. 14, Shelby County (Tenn. Crim. App. Apr. 11, 1990).

Moreover, we agree with the defendant that the evidence preponderates against the trial court's imposition of the requirements of twenty-four-hour residential supervision and supervised administration of the defendant's medicine. Prior to the hearing on mandatory outpatient treatment, the MMHI treatment team recommended that the defendant live with her parents at their home while participating in mandatory outpatient treatment. At the hearing, Dr. McNeal testified that this recommendation was based upon the supportive environment that her parents would provide and their ability to monitor her mental stability. Neither Dr. McNeal nor Dr. Smith were asked whether the defendant should live in a residential facility with twenty-four-hour supervision. The first mention of a supervised residential facility at the hearing was when Shirley McGowen, a professional counselor from FFCC, suggested that such a facility could supervise the dispensation of the defendant's medicine. Both she and professional counselor Laverne Hoke stated that the defendant was higher functioning than the residents of facilities providing twenty-four-hour supervision. Thus, nothing in the record before the trial court shows the defendant needs to live in a residential facility with twenty-four-hour supervision.

We note that the defendant's father testified that he and her mother had not detected a change in the defendant's mental condition before the offense. Although this testimony does cast some doubt upon the defendant's parents' ability to monitor her mental stability, we observe that before the offense, the defendant was taking an antidepressant. The record does not reveal if or how this medication served to mask the symptoms of her psychosis. At any rate, the MOT plan allows for the defendant's mental condition to be monitored by a host of mental heath care professionals as well as her parents. Dr. Smith testified that it would at least take days for the defendant to begin to show notable changes in her mental condition if she stopped taking her medication. This evidence preponderates against the trial court's finding that the defendant needs twenty-four-hour supervision.

With regard to the requirement that the administration of the defendant's medication be supervised at least five days per week, the record also preponderates against this condition. Dr. McNeal testified that the defendant was capable of taking her medicine herself and did not need to be monitored in this regard. Instead, he believed monitoring was necessary to assess how the defendant was responding to her medicine. He also said that the defendant, a registered nurse, was aware of the problems associated with a change in her medication and intended to be very careful about such changes in the future. Ms. McGowen, who worked with the defendant at FFCC in the time period between the offense and her evaluation at MMHI, testified that the defendant reported compliance with her medications during this time and showed no symptoms of her illness to indicate that she was not taking her medicine. The record contains no evidence that the defendant has ever been remiss in taking her own medication and preponderates against the trial court's requiring her to be supervised when she takes it.

Based upon the foregoing and the record as a whole, we affirm the trial court's imposition of mandatory outpatient treatment. We believe the evidence supports the MOT plan as modified by

-10-

the court with the deletion of the requirements that the defendant live in a residential facility with twenty-four-hour supervision and that administration of the defendant's medication be supervised five days per week. The defendant does not otherwise challenge the MOT plan imposed by the court, although the evidence at the hearing indicates that funding may not be available to implement the plan as ordered. In the event that the defendant's mental health care providers are not able to implement the MOT plan, they or the defendant may bring the matter before the trial court for further revision of the MOT plan as needed. We remand the case to the trial court for modification of the MOT plan and reinstatement of the condition that the defendant live with her parents.

_____
JOSEPH M. TIPTON, JUDGE